Good morning, your honors. Joseph Vaudemoy, on behalf of Mr. Bachelorelli, the appellant in this case. I'm going to try to reserve a couple of minutes. I don't have my thing on. It's clicking down. We're taking your time away. Oh, I'm sorry. All right. I guess the light isn't working, but your time is going down. All right. Anyway, what I want to argue today is the due process issue presented by Webb versus Texas and U.S. versus the Vodgers. There's basically two issues. One is the intimidation of the civilian witness, the defense witness, Mr. Hargit. And I think this case is presenting a case, basically a first impression of what I can see. And the issue is in between trial number one and trial number two, is it proper for the U.S. attorney to bring a defense witness who testified in the first trial in front of a grand jury? You know, in effect, advising him that he was suspected of perjury, having him take the Fifth Amendment to preserve. He didn't take it. He had to advise the counsel. Advise the counsel, but obviously advise the counsel. The U.S. attorney didn't say for the grand jury, you might want to take the Fifth Amendment. No, the U.S. attorney did not tell him to take the Fifth Amendment. He had his own attorney. Yes, but it's the act of putting him in front of a grand jury that was investigating him. That, to me, was intimidation. And it's a different kind of intimidation than we find with the judge in the Webb case. Even after the grand jury proceedings, though, he decided that he would testify at the second trial. Two years later, he decided he would testify at the second trial. That was my contribution. But then what happened was they appointed counsel. In court, the U.S. attorney said that she thought he had committed perjury. Mr. Domingo, who was the new counsel on the case, relied on the fact that he was representing Mr. Vargas in the area of perjury. And therefore, Mr. Domingo recommended, and he took Mr. Domingo's recommendation to take the Fifth. Before the district court, did the judge raise the question of Mr. Vargas' need for appointed counsel? Or did the U.S. attorney say, hey, judge, we have a problem here. This fellow might be committing perjury, and you might want to get counsel. Well, the judge asked, do you think that he committed perjury? And the government said yes. Perjury in the first trial. In the first trial, yeah. And my representation basically was that he was going to say the same thing again at the second trial. And then the judge appointed counsel because I made it clear to Mr. Vargas I was not his lawyer, and I could not give him legal advice as to what to do. But the bottom line is that when you have a witness who's on the verge of wanting to take the Fifth, I presume, because he already took the Fifth in between the two trials, it's a very fine line in that situation. And I think that's clear that there should be a rule that that is improper to do. But in the end, his prior testimony was read to the jury. But if you look at the Hammond case, it makes it crystal clear that, you know, having a live witness, in that case, the Hammond case, it was a stipulation, but having a live witness trumps having something read to the jury from a previous trial. And we were deprived of a real live witness. And this witness was crucial because he contradicted Mr. Meston on a crucial issue. So this was not some peripheral minor point that Mr. Vargas was speaking to. Mr. Vaudenoye, glad to see you again in Hawaii. I saw you in Moscow, I think. No, I thought it was Pasadena. It might have been. I saw you again. I guess my worry- I want you to know I'm not stalking you. All right. Well, I'm not stalking you either. What is my standard of review? Because I think my good colleague put it in perspective. We had all this fight about what ought to happen here, what ought to be the situation, and yet, you know, a judge is sitting on the court bench and he's got a witness who might be putting himself in jeopardy that isn't the prosecutor who brings up the problem. It's the judge who brings up the problem. And then the judge gives his attorney the chance to tell him what to do. And we don't know what happened in that discussion, but he takes the Fifth Amendment. And then they say-and then the judge lets you brief it. So you brief and say, I want the information nonetheless, and the judge gives you that. Given that kind of a situation, what's my standard of review? Standard of the issue, I'm relying on the Hammond case for the concept that live is better than stipulation or whatever. So I didn't have what I wanted. I mean, you know, half a loaf is better than no loaf at all. And my position at the time was if I can't have the live witness, at least let me have what I can get. Well, isn't the standard harmless error? Yes, it's harmless error or prejudice. That is the standard. And in our case, we're suggesting that it is prejudice and that the defendant was severely prejudiced because what it went to. It went to the impeachment of Meston. Whether somebody believed him or didn't believe him, that was really an issue for the jury to decide. But he was-I would point out in the Webb case, in the original case, the dissent said guilt was overwhelming. And nevertheless, they said that because the judge drove the witness off the witness stand, in effect, by telling him, I'm going to have perjury, and if you commit perjury, I'm going to give you extra time and this and that. They didn't do that here, though. No, no, no. I'm not-this is not about the judge doing something. I'm talking about the U.S. attorney in between two trials bringing a crucial defense witness in front of a grand jury investigating the witness. And I'm suggesting that that's improper. That's really the foundation. And especially when we had evidence about Mr. Meston receiving drugs, buying a ship, getting the shipments, doing the property, and so forth. So our position is that this is an accomplice, a convicted felon, testifying against him under the Berger case. That is not a strong case. And my position is also that the evidence is cumulative because of the James versus Illinois situation in this case. And James version, in ruling that the government kept me from using my expert witness in all aspects that he was going to testify to impeach the- Well, I thought he did testify. He did testify. He testified, as you had wanted him to, as I understood it. And then he was impeached. No, no. Is that not what happened? No, no. And the issue is he was impeached with statements that were improper under Miranda. Is that what happened? No. No? What happened was- You're misunderstood. No. Let me- Set me straight. That's why I'm here. All right. He testified about certain things that, as an expert from the DEA, he was not allowed to testify about two issues. Those two issues were relating to how the DEA investigated the case. Number one, he was not allowed to say that they should have searched Meston's house, and number two, they should have followed the money and seen- and done a check of the money. She did not allow me to raise those issues with the- If you raised those issues that related to the scope of the investigation, then the government could bring out that there had been a confession. Yeah, the un- Explained why the investigation was- The un-Miranda- Correct. There was an un-Miranda statement that I was- Your argument is that ruling was contrary to James. Yes, exactly. Why is it contrary to James if this was your expert witness? Because my expert- If you look at the James case, the standard and the holding in the James case is that you can't impeach a defense witness. Right. You can impeach- Harris lets you impeach- You cannot impeach a defense witness except under two circumstances. One is a psychiatrist. That's the Wilkes case where the defendant told the psychiatrist some story, and they said, well, you can't lie to the psychiatrist and get away with it, in effect. And the other case relates to the fact that where there's hearsay evidence, where somebody comes in and a defense witness says, oh, the defendant told me I wasn't there, or whatever it is. That's a different story. You can't use that either. However, your expert witness is allowed to use his testimony more than just the testimony in the record, is he not? Yes, but he- Now, just a minute. If that's so, and he can use all the experience he has and all the documents that he's looked at and everything that he knows that no one else knows, and then he makes an expert decision on that particular situation, then he knows what your client or what other people have said. He knows what they've said, whether they've said it or not. So we're not really talking about that in an expert testimony situation. If we're going to be able to impeach the expert, we've got to be able to impeach him on everything he knows, even that which is inadmissible at trial. That's normally done in civil cases and criminal cases because there's some evidence upon which he makes his decision that is not admissible, and nonetheless he makes his decision. So in this case, that's all that the judge said. You've had a chance to look at everything. So, therefore, you ought to be impeached by that which you've looked at. And that may be such that it wouldn't come in, but it's just a cross-examination of your expert, like we do under every situation. Well, I respectfully disagree that there should be an expert there. Well, I wouldn't be surprised. Yes, I don't mean to shock the court by saying that. Well, I don't get shocked, and I don't worry. I just want an explanation. Well, the explanation is the expert witness, if you look at the expert witness, did not interview the defendant, did not talk to the defendant, was only talking about the areas that he was not allowed to testify related to the procedures of the DEA or law enforcement basically as to how they should conduct their investigation. And that is a different story than a psychiatrist in the Wilkes case where he talked to the defendant, the defendant said, you know, I'm sane or I don't remember or whatever it is, and then he says... Well, but the problem comes, and again, maybe my question was bad, but if he can look at all the evidence regardless of whether it's admissible or not, then why can't he be cross-examined on that evidence he looks at or doesn't look at in order to sustain his expert decision? And if there's evidence out there that says his decision is wrong, even if it's not admissible, he ought to be cross-examined on it if he's going to give an opinion. Well, but you have the James case, which clearly states that a defendant... It doesn't clearly state that all expert witnesses... Here's my problem with the James case, and I didn't ask my question very well earlier. But there is an exception to the admissibility of unmerandized statements where the defendant himself testifies. And if he has made a statement that's inconsistent, then it can be introduced. Now, here we have the defendant's own expert. Now, why shouldn't the defendant's own expert, who is testifying on behalf of the defendant as to the nature of what the police did, why should he not be impeached with the defendant's confession that gave the reason for why the investigation was cut short? Because if it was shown that he relied in any way or read the report or read any statements or took into consideration what the defendant said, then that's fine. But the problem is that there's no showing that he interviewed the defendant, met the defendant, talked to him, read any report about the defendant, and therefore what we have is carving out an exception on the grounds that you could have read something. So if he had been asked, is this a failure to lay a foundation? Is that your... that if he had been asked first, were you aware that the defendant confessed? Well, I wouldn't want to put that in front of the jury, but I could ask, did you read any statements from the defendant? Did you talk to the defendant? I see my time is up. But, I mean, if you could lay a foundation that he didn't rely on, one, the defendant's statement, and two, his testimony wasn't really relating as such. Thank you very much. Good afternoon, Your Honor. Beverly Weiss, Amishim, on behalf of the United States. I think the district court read James in the appropriate way, and that was that it was a sharply divided Supreme Court 5-4, and there the point was that the court said you have to balance the reasons for the exclusionary rule against the trial's truth-seeking function. And in this case, because it wasn't a recipient witness who does not necessarily have as much incentive to lie, because they're just telling what they saw or what they personally know, and this was an expert witness who is relying on, basically, material that's provided to them by one adversarial party, and therefore does have a slanted or so-called bias. Did anybody ask the expert whether or not he had considered anything the defendant said to him? No, no, we did not because we didn't want to go into that area. Now, this is not on the record, but we have to map it. I don't really care what's in the record. No, no one did. No one did in either of the trial testimony, as I recall, at least not in the second trial. So what you wanted to do with this expert, when you stood up to cross-examine him, would your opinion still be the same if you knew X, Y, or Z? Absolutely. That's what you want to do. That was the whole reason the law enforcement officer did not. I beg to differ with you, but I don't read James the way you do. I think that the James case is a situation, because then you would get a skewed situation in front of the jury that the very reason the officers did not do a thorough search, and by the way, they did search it. You can call the officers on the stand and go through what they did and whatnot. No, and the defense did that. So for him to say he did not get that evidence out, he did get it out. He got out the fact that the officers executed a search on Elliott's house for an hour and then only spent ten minutes at Meston's house. He got out evidence that they did not do a thorough investigation of Meston's finances, whereas they did find cash in Elliott's house. So he was able to use that evidence without my being able to impeach his expert, and he was able to use that to advance his theory of the case in closing where he argued that somehow. The defendant made a number of statements after he was morandized. That's correct, and we found that those were incriminating. The court did not suppress those. Those weren't evidence, so we feel that the evidence was overwhelming. Even assuming there was a James there, was it harmless? Your Honor, it was harmless because the evidence was substantial. We had other incriminating statements by the defendant. We had the searchie powder on his hands. We had the air bill in his pocket. We had the testimony of the co-defendant. We had corroborating FedEx records regarding the many shipments of drugs to the defendant. So we would argue that it was harmless, and he was able to get out in essence the information he wanted without my being able to put in that first confession, and he was able to use it in an effective way in his closing argument before the jury. So what was there a need to hold Mr. Vargas before the grand jury between the second and first trial? Your Honor, the court's probably aware there was a very long history with respect to the first trial, which resulted in a published decision. There were numerous references by the district court about the utter implausibility of the testimony of some of the witnesses, and given the strange and surprising nature of some of the testimony, we felt it was our obligation to convene an investigation on obstruction charges. Now, there's nothing in the record which indicates that Mr. Vargas was the target. In fact, it's DOJ policy to not subpoena targets to the grand jury, and there's nothing that indicates that he was told that. He was a witness to the grand jury, and I was contacted on the morning of his testimony by an attorney who said she represented him, and that was the only contact I had had before that. She told me he was going to claim the fifth, and when he went into the grand jury, he did so. So I felt that the government was under an obligation to do something, given what had happened in the first trial. So when you got to the second trial, who raised with the district court judge? Your Honor, because Mr. Vaudenoye, I think at one of the pre-court out-of-the-jury sessions, indicated Mr. Vargas was going to testify. He listed it on his witness list, and he said he was going to testify and not claim the fifth. I filed a motion asking the court to have him make an offer of proof because I did not want the same situation to occur as had occurred in the first trial, and I wanted to flesh out that there may be a possibility he would claim the fifth, given what he did in front of the grand jury. And the judge herself said that on the record. Well, you know, given that he did claim the fifth, and now he's going to testify, and Mr. Vaudenoye said it's the same testimony. It was the same subject matter that was raised. He clearly had an issue that needed to be fleshed out, so I raised it actually in a pre-trial brief where I asked the court to flesh this out before we got before the jury. So that's how it came up. Did she appoint counsel for the witness? She did. She did appoint counsel for the witness, and he finally did come after he was subpoenaed. He took the stand, and he basically would not answer anything, and that's how it all arose. Any other questions for the court? Thank you. Thank you. The case just argued a subpoenaed decision. That concludes the court's calendar for this morning at the law school. I want to thank the members of the audience for their patience in listening to us and inviting us here. The dean is sitting back there. And I think that the arguments, speaking for myself, but I think also for the panel, that the cases that you've heard this morning represent a pretty fair sampling of the variety of the cases that come before the circuit, immigration cases, civil cases, criminal cases, habeas, so that I think you've had pretty good sampling. And I thank the panel members for being here as well, and that this court for this session stands adjourned.
judges: Schroeder, Paez, Smith